# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

|  |  |
|---|---|
| DANE L. DUCKETT, | |
|      Plaintiff, | Case No. 2:18-cv-00024 |
| v. | Chief Judge Waverly D. Crenshaw, Jr. |
| | Magistrate Judge Alistair E. Newbern |
| CUMBERLAND COUNTY SHERIFF DEPARTMENT et al., | |
|      Defendants. | |

To:    The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

## REPORT AND RECOMMENDATION

This action brought under 42 U.S.C. § 1983 arises out of pro se and *in forma pauperis* Plaintiff Dane L. Duckett's pretrial detention at the Cumberland County Jail (CCJ) in Crossville, Tennessee. (Doc. No. 81.) Duckett alleges that Defendants Cumberland County Sheriff Casey Cox, CCJ Administrator Tim Claflin, CCJ Nurse Jeff Shelton, and CCJ Consulting Physicians Dr. Stacy Carlton and Dr. Richard Buurman denied Duckett adequate medical care for liver disease in violation of his constitutional rights. (*Id.*) Before the Court are the defendants' renewed motions for summary judgment (Doc. Nos. 234, 241) to which Duckett has responded in opposition (Doc. Nos. 246, 250), and Cox, Claflin, and Shelton have filed a reply (Doc. No. 254). Considering the record evidence, and for the reasons that follow, the Magistrate Judge will recommend that the Court grant the defendants' renewed motions for summary judgment.

# I. Background

## A. Factual Background[1]

Duckett has been held in the custody of the Cumberland County Sheriff's Department (CCSD) on several occasions dating back to 1996. (Doc. Nos. 236-2, 237, 247.) As relevant to his remaining claims in this action, evidence in the summary judgment record shows that Duckett was incarcerated at CCJ from July 6 to July 10, 2017, and from October 15, 2017 to July 19, 2018. (Doc. No. 236-2.)

### 1. Duckett's July 2017 Incarceration at CCJ

Duckett completed a CCSD medical intake form on July 6, 2017, stating that he had "Hep[atitis] C" and was recently "hospitalized" for "liver cancer" but was not taking any medication. (*Id.* at PageID# 1655.) Duckett saw a nurse at CCJ on July 9, 2017. (Doc. Nos. 203, 236-2, 244.) Notes from that visit reflect that Duckett "ha[d] [pre]script[ion]s for some imaging," told the nurse "he ha[d] a mass in his liver, abdomen and pancreas[,]" and "refused to sign a medical release form." (Doc. No. 236-2, PageID# 1656.) Duckett also stated that "he fe[lt] safe to go [in]to [the general] population" at CCJ. (*Id.*) Duckett confirms that he told the nurse he "had [a] p[re]scription to see what [was] on [his] liver" (Doc. No. 203, PageID# 1216), but states that he "[a]t no time refused to sign anything . . ." (Doc. No. 201, PageID# 1205, ¶ 9). Carlton was the

---

[1]    The facts in this section are drawn from the defendants' statements of undisputed material facts (Doc. Nos. 237, 244), Duckett's responses to those statements (Doc. Nos. 203, 247), the parties' and their expert's summary judgment affidavits (Doc. Nos. 199, 201, 236-1–236-3, 243-1–243-3, 248, 249, 251), and the parties' summary judgment exhibits (Doc. Nos. 205–205-2, 236-1–236-3, 250-1). As explained herein, the defendants' statements of undisputed material facts and declarations filed in support of their renewed motions for summary judgment are virtually identical to the statements of undisputed material facts and declarations filed in support of their first motions for summary judgment. The Court has therefore considered some of Duckett's sworn responses to the defendants' earlier filings (Doc. Nos. 199, 201, 203) and Duckett's previously filed summary judgment exhibits (Doc. No. 205–205-2) in evaluating the defendants' renewed motions for summary judgment.

2

CCJ physician consultant from approximately October 7, 2014, until August 31, 2017. (Doc. Nos. 203, 243-2, 244.) Carlton states that she "reviewed a nursing note of July 9, 2017 noting that [ ] Duckett continued to refuse to sign a medical release" and "felt safe to go into the general population . . . ." (Doc. No. 243-2, PageID# 1746, ¶ 4.)) Duckett was released from CCJ the next day. (Doc. No. 236-2.)

### 2. Duckett's October 2017 to July 2018 Incarceration at CCJ

#### a. Intake Form and Initial Nurse Visits

Duckett completed a CCSD medical intake form on October 15, 2017, stating that he had Hepatitis C, cancer, and was hypoglycemic and listing his medications as Opana, Roxicet, Phenergan, and Gabapentin.[2] (Doc. No. 236-2, PageID# 1657.) Duckett asserts that, when he was arrested and booked into CCJ, he gave the booking staff prescriptions for imaging that he had in his wallet, asked them to make a copy for him, put the copy in his wallet, and told medical staff that he had turned in the prescriptions. (Doc. Nos. 199, 247.) The summary judgment record contains two prescriptions signed by Dr. David G. Florence for a CT of Duckett's abdomen and pelvis with contrast to assess a mass on the right lobe of his liver. (Doc. No. 205.) One prescription is dated March 28, 2017, and the other is dated June 12, 2017. (*Id.*)

Claflin states that CCJ "has an electronic kiosk" that allows resident inmates to make "requests to jail personnel" including sending "sick call requests or inquiries to medical personnel" and "grievances [to] the jail command staff." (Doc. No. 236-2, PageID# 1575, ¶ 3.) On October

---

[2]    Opana is an "opioid analgesic" used to treat "severe pain," Roxicet is an "opioid analgesic" used to treat "moderate to severe pain[,]" and Gabapentin is used to treat "seizure disorders, chronic neuropathic pain . . . , anxiety, bipolar disorder, [and] restless legs syndrome[.]" 3 Dan J. Tennenhouse, *Attorneys Medical Deskbook* § 40:4 (4th ed. updated Oct. 2021). "Phenergan" is an "antihistamine, anxiolytic, [and] sedative" used to treat "allergies and anaphylactic shock, insomnia, motion sickness, surgical sedation, nausea and vomiting from anesthesia and surgical pain, as an adjunct to anesthesia[.]" *Id.*

24, 2017, Duckett submitted a medical resident request stating that he "ha[d] cancer in [his] pancreas" and "Hep[atitis] C" and needed an emergency appointment. (Doc. No. 236-3, PageID# 1673.) Shelton asserts in his summary judgment declaration that he met with Duckett two days later on October 26, 2017, and Duckett "reported that he had a previous prescription." (*Id.* at PageID# 1668, ¶ 4.) Shelton's notes from the appointment state that Duckett "want[ed] [a] CT scan" based on a prescription dated June 12, 2017. (*Id.* at PageID# 1673.) Shelton states that he "explained to [Duckett] that the [jail] doctor would need to review his medical records to make a decision regarding treatment" and that, "[w]ithout that information, there was no way to know whether the old prescription was valid, whether the ordered testing had been done, or whether the jail physician would determine that other additional testing was necessary." (*Id.* at PageID# 1668, ¶ 4.) Shelton asserts that Duckett "refused to sign a release" authorizing CCJ to obtain his medical records. (*Id.*) Shelton's notes from the appointment reflect that Duckett "state[d] [that a] copy of [the] script from 6-12-17 is all that is needed." (*Id.* at PageID# 1673.) Duckett does not dispute that he saw "Shelton around the [e]nd of Oct[ober] 2017" (Doc. No. 249, PageID# 1790, ¶ 6); however, he states "that he never reported that he had pancreatic cancer" (Doc. No. 251, PageID# 1909, ¶ 3(a)) and "never refused to sign [a] medical release" (Doc. No. 247, PageID# 1775, ¶ 8).

Buurman was the consulting physician at CCJ beginning on or around October 3, 2017. (Doc. Nos. 236-1, 243-1.) Buurman states in his summary judgment declaration that he reviewed Shelton's notes from the October 26, 2017 appointment with Duckett. (Doc. No. 243-1.) Buurman's notes in the record, dated November 9, 2017, state that he "w[ould] need medical records to review [Duckett's] pancreatic cancer status[.]" (Doc. No. 263-3, PageID# 1673; *see also id.* at PageID# 1668, ¶ 5; Doc. No. 237, PageID# 1709, ¶ 9.)

Duckett saw CCJ Nurse Gabrielle Starnes the day after his appointment with Shelton, complaining that he was "[d]izzy" and "mostly worried about his cancer[.]" (Doc. No. 236-3, PageID# 1674.) Starnes's notes from that appointment reflect that Duckett "want[ed] . . . to go to his CT scan." (*Id.*) Starnes gave Duckett an inmate physical the next day. (Doc. No. 236-3.) Her notes from that physical state that Duckett's medications included "Roxicet" and "Opana" and that his diagnoses included "Hep[atitis] C" and "[c]ancer[.]" (*Id.* at PageID# 1675.)

### b. Duckett's Requests for CT Scans

On November 14, 2017, Duckett submitted a resident request to Claflin complaining that he was "denied [the] CT scan o[r]dered by [his] doctor" and that his cancer "ha[d] spread[ ] to three other organs" and he "ne[e]d[ed] treatment please." (Doc. No. 236-2, PageID# 1659.) Claflin spoke to Shelton and asked him to look into it. (Doc. Nos. 236-2, 236-3.) Shelton states that he spoke to Duckett again and that Duckett showed him the two CT prescriptions signed by Florence. (Doc. No. 236-3.) Shelton "had no information as to whether [ ] Duckett had previously undergone the imaging, and if not, why he had not." (*Id.* at PageID# 1669, ¶ 7.) However, Shelton "did know that, at the time, Dr. Florence was under investigation by the State for fraud and running a pill mill." (*Id.*) Shelton's notes in the record state that he "explain[ed]" to Duckett "that medical records" including "[r]ecords of diagnosis, treatment, labs and results of prior CT scans must be reviewed" by the "jail[']s doctor." (*Id.* at PageID# 1677.) Duckett asserts that he "told [ ] Shelton [he] had not had [the CT scan] do[ne] ye[ ]t[.]" (Doc. No. 249, PageID# 1790, ¶ 8.)

Buurman reviewed Shelton's notes regarding this conversation with Duckett. (Doc. No. 243-1.) Buurman's own notes in the record, dated November 16, 2017, state:

> I have before me two scripts for CT scan of abdomen [and] pelvis with contrast. These are dated 3/28/17 [and] again 6/12/17. Both are supposedly from Dr. David Florence, but they are on different style[s] of prescription pads. The question is why inmate did not get these done at the time his [doctor] was requesting it to be done. Rather, he now decides that it is important to deal with now.

> For me to order a CT scan of both abdomen [and] pelvis I <u>will</u> require [a] copy of the medical records to review the need for ordering the test. This is standard and prudent medical practice.

(Doc. No. 236-3, PageID# 1677.)

Claflin asserts that "one of the nurses" told him "that [ ] Duckett had refused to sign a medical release so the doctor could review his medical records" and "that[,] if [Duckett] signed a release, then the doctor could order any appropriate testing." (Doc. No. 236-2, PageID# 1577, ¶ 10.)

Shelton states that, "[a]fter discussing the issues further with [ ] Duckett, he finally agreed to sign a release on November 16, 2017." (Doc. No. 236-3, PageID# 1669, ¶ 8.) Duckett states that he "signed [the] release when asked[.]" (Doc. No. 249, PageID# 1790, ¶ 9.) The record contains a release signed by Duckett on November 16, 2017, authorizing Florence to release Duckett's medical records to CCSD, including a "[d]iagnoses list[,]" "[p]athology [r]eports[,]" [l]aboratory [r]eport[s,]" "[r]adiology [r]eports[,]" "current [diagnosis and treatment,]" "CT scans/cancer[,]" and "ultrasound [r]esults." (Doc. No. 236-3, PageID# 1678.)

Shelton states that they faxed the release and records request to Florence's office "multiple times." (*Id.* at PageID# 1669, ¶ 8.) There is a fax transmission verification report in the summary judgment record showing an attempt to fax a document to Florence on November 17, 2017, that was unsuccessful because the number was "busy[.]" (Doc. No. 205, PageID# 1237.) The copy of the release and records request that Shelton attached to his summary judgment declaration has three stamps stating that the document was faxed to Florence on November 21, 27, and 30, 2017. (Doc. No. 236-3.) The record shows that Duckett submitted several resident requests asking if Florence had sent over his ultrasound yet. (Doc. No. 205.) On November 21, 2017, Shelton responded to one of Duckett's request and explained that "[t]he doctor[']s office is not receiving faxes and we are still trying to contact them." (*Id.* at PageID# 1268.)

6

Duckett wrote a letter to Buurman on November 24, 2017, stating that Florence performed an ultrasound on Duckett before his most recent CCJ incarceration that showed "a mass as big as [his] hand[ ] that covered the bottom half of [his] liver to [his] pa[]ncre[a]s and abdom[e]n[ ][.]" (*Id.* at PageID# 1253.) Duckett stated that he "ha[d] signed the papers . . . to release this information to [Buurman]," and that Florence had recommended Duckett "have a C.T. scan with [c]ontras[t][.]" (*Id.*) Duckett complained that there was "a spot . . . in the [c]enter of [his] stomach[ ]" that was "get[t]ing big[g]er, and [his] liver ha[d] been killing [him] . . . ." (*Id.*) Duckett wrote a second, similar letter to Buurman on December 1, 2017. (Doc. No. 205.)

Buurman states that he "received a letter from [ ] Duckett complaining of an abdominal mass" and that he subsequently "examined [ ] Duckett[.]" (Doc. No. 243-1, PageID# 1743, ¶¶ 3.c, 3.d.) Duckett concedes that Buurman examined him "one time." (Doc. No. 251, PageID# 1909, ¶ 3(d).) Notes in Duckett's medical record dated December 7, 2017, and signed by Buurman indicate that Duckett reported abdominal pain during the examination and explained that he had saved up the money to pay for the CT scan prescribed by his doctor "three times" but the money "was confiscated when [he was] picked [up]/stopped by law enforcement." (Doc. No. 205, PageID# 1257.) Buurman ordered an ultrasound of Duckett's liver and blood tests on December 7, 2017.[3] (Doc. Nos. 205, 236-3, 237, 251.)

---

[3]      Duckett's sworn statements regarding whether Buurman ordered blood work on December 7, 2017, are inconsistent. His sworn response to Cox, Claflin, and Shelton's statement of undisputed material facts states that "Buurman never ordered lab work[.]" (Doc. No. 247, PageID# 1776, ¶ 15.) However, Duckett's sworn response to Buurman's declaration states that "Buurman ordered blood work on one occasion" (Doc. No. 251, PageID# 1909, ¶ 3(f)), and his sworn response to Shelton's declaration refers to "the [b]lood test Buurman did in Dec[ember] 2017" (Doc. No. 249, PageID# 1791, ¶ 10). A physician's order form in the summary judgment record dated December 7, 2017, and signed by Buurman includes an order to run "[l]abs CMP" (Doc. No. 205, PageID# 1395), which stands for "comprehensive metabolic panel" 2 Dan J. Tennenhouse, *Attorneys Medical Deskbook* § 19:31 (4th ed. updated Oct. 2021). Duckett himself has submitted the results of a comprehensive metabolic panel ordered by Buurman and performed

### c. December 2017 Bloodwork and Liver Ultrasound

Starnes drew Duckett's blood on December 8, 2017, in accordance with Buurman's order. (Doc. Nos. 236-3, 237.) The results of that blood work showed that Duckett had "[h]igh" levels of "AST" and "ALT[.]"[4] (Doc. No. 205, PageID# 1258; Doc. No. 250-1, PageID# 1827.) Handwritten notes signed by Buurman on the lab results report state, in part, "ALT, AST elevated scheduled for liver US soon[.]" (Doc. No. 205, PageID# 1258; Doc. No. 250-1, PageID# 1827.) Duckett states that no one showed him these test results and that Buurman told Duckett that his health "was good" and did not mention the elevated ALT and AST levels. (Doc. No. 251, PageID# 1909; *see also* Doc. No. 246, PageID# 1769.)

Duckett received a liver ultrasound on December 19, 2017, at Cumberland Medical Center. (Doc. Nos. 236-3, 237, 250-1.) The ultrasound report stated that "no definite masses [were] identified." (Doc. No. 250-1, PageID# 1829; Doc. No. 236-3, PageID# 1684.) However, the report noted that "[t]he [previous] [ultrasound] [in] which a mass [was] identified [was] not available for review" and that, "[i]f that should become available . . . [i]t is recommended that that study [be] compared."[5] (*Id.*) It further noted that "[t]he lack of significant sonographic finding does not

---

on a sample collected on December 8, 2017. (Doc. No. 250-1.) There is thus no genuine dispute of material fact that Buurman ordered bloodwork on December 7, 2017.

[4]    The acronyms AST and ALT refer to "Aspartate Aminotransferase" and "Alanine Aminotransferase[,]" respectively. 2 Dan J. Tennenhouse, *Attorneys Medical Deskbook* § 19:31 (4th ed. updated Oct. 2021). Elevated levels of ALT and AST may indicate "various liver disorders, including . . . hepatitis, . . . liver tumor, [or] cirrhosis." *Id.* Cirrhosis is "[e]xtensive scarring" to the liver. 2 Dan J. Tennenhouse, *Attorneys Medical Deskbook* § 24:34.20 (4th ed. updated Oct. 2021).

[5]    Shelton asserts that CCJ "did not receive records . . . from Dr. Florence's office" "prior to the ultrasound" on December 19, 2017, but "later received records" including "an abdominal ultrasound which revealed that [ ] Duckett's pancreas was normal, and a possible hemangioma was noted on his liver." (Doc. No. 236-3, PageID# 1669, ¶ 8.) Duckett asserts that Buurman and Shelton "had [the first ultrasound] the [w]hole time" but did not send it to Cumberland Medical Center. (Doc. No. 247, PageID# 1776, ¶ 17.) It is not clear from the copies of the first ultrasound

8

exclude the presence of some liver masses which may be isoechoic on ultrasound." (*Id.*) Duckett states that he received a copy of the ultrasound result from Cumberland Medical Center. (Doc. No. 249.)

Duckett sent a medical resident request on December 20, 2017, asking "[n]ow that my ultra sound has been done . . . are [you] going to h[a]ve the CT scan done with contrast or am [I] going to get a furlo[ugh] to [the] next court date[?]" (Doc. No. 205, PageID# 1268.) Shelton responded the next day that "[t]he ultrasound was good. The[]r[e] are no current plans for a CT scan at this time." (*Id.*)

Duckett sent a resident request to Claflin on December 26, 2017, complaining that "med[ical] [was] saying [that his] ult[r]a so[u]nd was good" but that was "not true" and requesting a "C.T. scan with contrast" as prescribed by his doctor. (Doc. No. 236-2, PageID# 1660; *see also id.* at PageID# 1577, ¶ 11 (asserting that Claflin received this request from Duckett).) Claflin "talked to medical and was told the result of the ultrasound." (*Id.* at PageID# 1577, ¶ 11.) Claflin asserts that he responded to Duckett and told him "that he was getting treatment." (*Id.*)

Shelton states that he spoke to "Duckett on December 29, 2017[,] and again explained that the radiologist and a doctor had reviewed the ultrasound and that his liver was not enlarged at that time." (Doc. No. 236-3, PageID# 1669, ¶ 10.) Shelton's notes from that conversation state that he told Duckett that "no further [treatment] [was] indicated [at] [that] time" and that Duckett said he "need[ed] [a] C.T. scan to get disability, and if [he was] not given furlough" soon he would "sue

---

in the summary judgment record when CCJ received it from Florence. (Doc. Nos. 236-3, 250-1.) The fax machine date stamp on the copy Shelton submitted reads "01/30/2013" even though the records themselves are from October 2014 and January 2017. (Doc. No. 250-1.) However, a copy of a fax coversheet from Florence to Buurman that Duckett attached to his original complaint is dated December 27, 2017. (Doc. No. 1.) And there is evidence in the summary judgment record that Duckett told Claflin that Florence reported sending the fax sometime in December 2017. (Doc. No. 236-2.)

in federal court." (*Id.* at PageID# 1685.) Shelton asserts that "Buurman reviewed [his] notation of this conversation" on the same day (*id.* at PageID# 1670, ¶ 10) and Buurman's signature appears on the copy of Shelton's notes in the record (*id.* at PageID# 1685).

On January 23, 2018, Duckett sent two resident requests to Claflin. (Doc. No. 236-2.) The first stated that "someone [was] l[y]ing to [Duckett] and [Claflin]" because Duckett's aunt spoke to Florence, who told her that he personally faxed Duckett's ultrasound. (*Id.* at PageID# 1661.) The second stated that Florence "sent [a] fax of [the] mass on [Duckett's] liver and what[]ever ha[d] spread[ ] to [Duckett's] pancreas" "in December." (*Id.* at PageID# 1662.) Duckett complained that he was "in pa[i]n all the time[.]" (*Id.*) Claflin states that he "talked to medical person[nel] and again asked them to talk to Duckett." (*Id.* at PageID# 1577, ¶ 11.)

Shelton confirms that Claflin asked him to speak with Duckett again. (Doc. No. 236-3.) He states that "Duckett was provided with copies of medical records for his review in early February 2018." (*Id.* at PageID# 1670, ¶ 11.) Shelton further states that Duckett "claimed that portions [of the records] were blacked out" but that "they were not blacked out by [Shelton] or any other nurse" and that "darkened areas on some of the copies were from the quality of the copy received by the jail." (*Id.*) Shelton has not identified the specific records at issue. Duckett states that "the blacked-out test was the test that [his] doctor sent in to [the] jail medical dep[artment]" and that the blacked-out information had something to do with the right and left lobes of his liver and his pancreas.[6] (Doc. No. 249, PageID# 1791, ¶ 12; *see also* Doc. No. 199, PageID# 1194, ¶ 11.)

_____

[6]      Duckett has not pointed to a specific page in the summary judgment record, but he may be referring to the January 4, 2017 abdominal ultrasound report that Florence eventually faxed to CCF. (Doc. No. 205, PageID# 1398; Doc. No. 250-1, PageID# 1833.) That report contains a chart of "[m]easurements" in which certain cells are dark and hard to read. (*Id.*) It is not clear from the

### d. March and April 2018 CT Scans

On March 1, 2018, Buurman ordered a CT scan of Duckett's abdomen with contrast. (Doc. No. 236-3.) The CT scan took place on March 7, 2018, at Cumberland Medical Center. (*Id.*) The CT report noted evidence of "[c]irrhosis" and an "ill-defined" and "indeterminate" mass on Duckett's liver, in addition to gallstones and other conditions. (*Id.* at PageID# 1688; *see also id.* at PageID# 1670, ¶ 12.) It stated that "evaluation [was] suboptimal with IV contrast" and that an "MRI or CT with liver protocol could be performed to differentiate hepatocellular carcinoma from regenerative/dysplastic nodule."[7] (*Id.* at PageID# 1687, 1688.)

On March 22, 2018, Duckett submitted a resident request to medical stating "no one has got[ten] back with me on my CAT scan []and it[']s been 3 weeks []and I[']m in [m]a[jo]r pain." (Doc. No. 255-2.) On the same day, Duckett submitted a general resident request stating: "Att[ention] Casey[ ] Cox[,] I have had [a] test [] done and it[']s been 3 weeks [] and no one has told me the results [] and I[']ve asked [for] copies [ ]with no response[ ] and [I am] in ma[jo]r pain." (Doc. No. 255-1.) Claflin states that the kiosk "requests [were] not set up to send direct communications to Sheriff Cox" and that, "when a [resident] request [wa]s sent via the kiosk, Sheriff Cox would not see the request and it [was] addressed by staff or [Claflin]." (Doc. No. 255, PageID# 1932, ¶ 2.)

On March 27, 2018, Duckett submitted a resident request to medical stating that the results of his CT scan said he "needed [an] M.R.I. [or] C.T[.] with liver protocol" and asking Buurman "what [they were] going to do" about it. (Doc. No. 236-3, PageID# 1689.) Buurman ordered

---

copies of the report in the record if test result information is blacked out or if the darkened portions are shaded headers within the measurements chart.

[7]    "[H]epatocellular carcinoma" is "[c]ancer of the liver . . . ." 2 Dan J. Tennenhouse, *Attorneys Medical Deskbook* § 24:34.20 (4th ed. updated Oct. 2021).

another "CT scan with liver protocol to examine [the] indeterminate mass[.]" (*Id.*) Duckett received an abdominal CT "with and without IV contrast" on April 4, 2018, at Cumberland Medical Center. (*Id.* at PageID# 1690.) The CT report noted cirrhosis and gallstones, among other conditions, and stated that "[a] 9 mm ill-defined hypodensity in the right hepatic lobe is strictly too small to characterize and not visualized on the arterial or delayed phase images. No arterial enhancing lesions with washout to suggest hepatocellular carcinoma. Recommend continued surveillance." (*Id.* at PageID# 1690–91.)

After he received his CT on April 4, 2018, Duckett submitted a general resident request stating "att[ention] Sheriff[] Casey Cox[,] I just had my [third] test to see the mass on my liver and abdomen [] to see if it is cancer [o]r what it is[.] I[']m sick and have bee[n]. Test should be in in 3 hours. Either way I[']m going to need treatment what [are] [yo]u going [to] [d]o?" (Doc. No. 255-3.) On April 17, 2018, Duckett submitted a resident request to medical asking Buurman if Duckett was "going to get an MRI or CT scan with a liver protocol" and "lab work" "to see if carcinoma is present?" (Doc. No. 236-6, PageID# 1692.) Duckett complained that "all of the liver can[]not be se[e]n with the CT abdomen test they did on [him] last" and that the CT "ha[d] to be done with liver protocol and lab work." (*Id.*) Duckett stated that "everything ha[d] gotten worse since the last test" and that he was "in pain all the time[.]" (*Id.*) He asked Buurman to "please help" him. (*Id.*) Buurman's handwritten notes on a copy of Duckett's request state that a "CT scan [with] liver protocol show[ed] evidence of some cirrhosis" and a "poorly defined 9mm lesion . . . which is very small." (*Id.*) The notes further state that "enhancement [was] seen with IV dye protocol indicating [the mass was] not an hepatic carcinoma[.]" (*Id.*) Buurman wrote that he did "not feel that the liver [was] the cause of [Duckett's] abdominal pain" because the "[r]emainder of [the] CT scan [was] normal for abdominal contents other than . . . gall bladder stones[.]" (*Id.*)

Several days later, Duckett submitted another resident request to medical and asked Shelton if he was "going to get a[n] answer on [his] message that [he] sent in . . . ." (*Id.* at PageID# 1693.) Shelton states that he discussed the latest CT scan with Duckett on April 26, 2018. (Doc. No. 236-3.) Duckett asserts that Shelton gave him a copy of the test, which he had already received from Cumberland Medical Center, but states that when he asked Shelton "what [the] test said, . . . Shelton stated he was not a doctor and he did not know[.]" (Doc. No. 249, PageID# 1792, ¶ 14.) Shelton's notes from this conversation state that Duckett complained "that [the] CT scan [wa]sn't being done the right way." (Doc. No. 236-3, PageID# 1693.) Shelton states that he "confirmed via phone call with Cumberland Medical Center that the correct procedure was performed and explained that to [ ] Duckett on two occasions." (*Id.* at PageID# 1671, ¶ 14.)

On April 27, 2018, Duckett submitted a resident request to Claflin complaining that he "ha[d] rec[ei]ved [his] paperwork from CMC . . . and it shows that the tests that were performed on [him] ha[d] not included a liver protocol test[,] just[ ]routine abdomen tests." (Doc. No. 236-2, PageID# 1663.) Claflin states that he "spoke to medical and was told that the test had been confirmed by calling the Cumberland Medical Center." (*Id.* at PageID# 1578, ¶ 13.) Duckett submitted two more resident requests to jail administration complaining that the CT scan did not include a liver protocol. (Doc. No. 236-2.) Claflin responded to the first request, telling Duckett that "[t]he nurse has explained several times what the [doctor] did and what test[s] were conducted. The [doctor] is [the] decision maker on the plan of action for your test and medical care." (*Id.* at PageID# 1664.) Another administrator responded to the second request, noting that "Duckett was sent to the clinic . . . to talk to Nurse Shelton about more paperwork." (*Id.* at PageID# 1665.)

13

e.	**Duckett's Correspondence with Dr. Hendrixson, June 2018 Bloodwork, and July 2018 Appointment with Dr. Hendrixson**

Duckett sent a copy of the April 4, 2018 CT scan to Dr. Mark Hendrixson, a private doctor at Upper Cumberland Cancer Care, and asked Hendrixson what other tests he needed. (Doc. Nos. 236-3, 247, 249, 250-1, 251.) Hendrixson's office manager wrote back to Duckett on May 14, 2018, stating that "Dr. Hendrixson reviewed the letter and documents [Duckett] sent. He recommends that you have an Alpha Fetoprotein (AFP) tumor marker lab test done. If this is abnormal then you would need to see him for further workup." (Doc. No. 236-3, PageID# 1697; Doc. No. 250-1, PageID# 1841.) On May 20, 2018, Duckett sent a resident request to Claflin stating that he "ha[d] a l[et]ter from . . . Doctor Hendrixson [ ] saying [he] need[ed] a[n] alpha fetoprotein [(]AFP[)] tumor marker lab test done and[,] if [that test was] abnormal[,] [he] need[ed] to see [Hendrixson] [f]or further workup . . . ." (Doc. No. 236-2, PageID# 1666.) Duckett said that "med[ical] ha[d] the l[et]ter." (*Id.*) Claflin responded that he would "speak to medical[.]" (*Id.*) Claflin states that he "spoke to Medical and learned that [ ] Duckett would be referred to Dr. Hendrixson for an appointment." (*Id.* at PageID# 1578, ¶ 14.)

Buurman states that he "ordered laboratory testing with specific tumor marking testing[.]" (Doc. No. 243-1, PageID# 1743, ¶ 3.i; *see also* Doc. No. 236-3, PageID# 1671, ¶ 15 (Shelton asserting that Buurman "ordered the desired testing done").) Starnes drew Duckett's blood on June 4, 2018, for blood tests including an "AFP marker and liver[ ]cancer profile." (Doc. No. 236-3, PageID# 1698.) Lab results in the record show that LabCorp ran a "Liver Cancer Monitor Profile" and "AFP . . . Tumor Marker" test on Duckett's blood samples on June 5, 2018. (*Id.* at PageID# 1701.) The lab result reports state that Buurman ordered the testing.[8] (Doc. No. 236-3.)

_____

[8]	Duckett asserts in his sworn response to Shelton's declaration that "Buurman would not do the [blood] test that was recommended . . . to watch the l[e]vel of cancer in [his] blood[.]" (Doc. No. 249, PageID# 1792, ¶ 16.) However, in his sworn response to Cox, Claflin, and Shelton's

14

They also state that the levels shown by the AFP tumor marker test were "[h]igh[.]" (*Id.* at PageID# 1699, 1700, 1701.) Shelton states that he "called multiple times, with the approval of Dr. Buurman, to obtain an appointment for [ ] Duckett to [ ] see Dr. Hendrixson." (*Id.* at PageID# 1671, ¶ 16.) Shelton's notes in the record reflect that, when someone from Hendrixson's office called him back, she explained that "no app[ointments]" we available "before July 1st . . . ." (*Id.* at PageID# 1703.)

Duckett saw Hendrixson for an appointment on July 5, 2018. (Doc. Nos. 205, 236-3.) Hendrixson's notes from that appointment describe Duckett's history of present illness as follows:

> Mr. Dane Duckett is seen at the request of the corrections Department physician Dr. Buurman for further evaluation of a hepatic lesion previously noted. Mr. Duckett has a history of hepatitis C dating back to 1996. This [ha]s never been treated. Also has a history of alcohol use, but none since 2001. In January 2017 he received a hepatic ultrasound in Manchester[,] Tennessee during her [sic] evaluation and a[] 13 x 11 x 11 mm lesion was noted in the right medial hepatic lobe. Possible Splenomegaly was noted. A repeat Hepatic US in Jan 2018 showed nothing. He had a CT Abd in March 2018 and a 12mm hypodensity was seen in the R hepatic lobe as well as [lymph nodes] in the portahepatis. There was a micronodular contour to the liver and portal hypertensive collaterals noted all c/w cirrhosis. An MRI or a CT with liver protocol was recommended.[] So in Apr 2018, a CT Liver w&w/o contrast failed to show any hepatic enhancement or delayed washout. Nothing to suggest [hepatocellular carcinoma (HCC)]. [Lymph nodes] were again noted at 12mm and considered likely reactive. Spleen was reported as 14.8cm. Blood work in June 2018 AFP 15.4, CA19-9 12, Ammonia 110 (nl up to 102). Pt reports [left upper quadrant] fullness and some pain, abd bloating, pain in R flank, arm[ ]and leg cramps and fleeting [lymph nodes] noted in the neck and L axilla that have resolved.

(Doc. No. 236-3, PageID# 1704.) Hendrixson diagnosed Duckett with "[t]oxic liver disease with fibrosis and cirrhosis of [the] liver" and "[c]hronic viral hepatitis C[,]" among other conditions. (*Id.* at PageID# 1705.) Hendrixson wrote that he "had a long discussion of cirrhosis" and other

---

statement of undisputed material facts, Duckett asserts that he "do[es] not know nothing about Buurman and the l[e]tter [he] turn[e]d in" from Hendrixson. (Doc. No. 247, Page ID# 1777, ¶ 33.) Construing the record evidence in the light most favorable to Duckett, there is no genuine dispute that Buurman ordered the AFP tumor marker blood test.

15

conditions with Duckett. (*Id.*) His treatment notes state that Duckett's "values are all [consistent with] cirrhosis" and "[t]here [was] no radiographic evidence on CT Liver protocol to suggest [hepatocellular carcinoma]." (*Id.*) Hendrixson further stated that Duckett "just need[ed] to be followed, maybe every 6 months would be adequate." (*Id.*) Hendrixson prescribed Duckett Ibuprofen for his abdominal pain and planned to follow up with him in "5 Month(s)." (*Id.*)

### f.    July 2018 Release to TDOC Custody

"Duckett was released to the custody of the Tennessee Department of Corrections [(TDOC)] on July 19, 201[8]." (Doc. No. 236-2, PageID# 1578, ¶ 15.) The record contains an "order to transport [Duckett] to [the] Department of Correction for safekeeping" entered by the Criminal Court for Cumberland County, Tennessee, on June 26, 2018. (Doc. No. 205, PageID# 1307; Doc. No. 250-1, PageID# 1846.) The order states that the State of Tennessee made an "oral Motion . . . on June 20, 2018" "to transfer [Duckett] to the Department of Correction for safekeeping, pursuant to T.C.A. § 41-4-121." (*Id.*) The order further stated that

> [t]he defendant, Dane Lee Duckett, is presently being held in the Cumberland County jail charged with Possession of Meth, Sch. II, Over .5 grams with Intent to Sell or Deliver (X3), Theft Over $10,000; Simple Possession of Marijuana, Sch. VI; Possession of Drug Paraphernalia (X2); Possession of a Firearm During the Commission of a Felony; Possession of a Firearm by a Convicted Felon; and Driving on Revoked License. For the medical reasons set forth in the State's oral Motion made on June 20, 2018; stated more fully upon the record and incorporated herein by reference, the Cumberland County jail is an insufficient facility for this defendant to be held pending hearing[.]

(*Id.*) Duckett was transferred to TDOC's DeBerry Special Needs Facility on July 19, 2018. (Doc. No. 250-1.) He was transferred again to TDOC's Riverbend Maximum Security Institution in August 2018. (Doc. Nos. 236-2, 250-1.)

## B.     Procedural History

### 1.     Duckett's Pleadings, Buurman's Motion to Dismiss, and the Defendants' First Motions for Summary Judgment

Duckett initiated this action on February 28, 2018, by filing a complaint under 42 U.S.C. § 1983 alleging violations of his constitutional rights against CCSD, Cox, Claflin, Shelton, and Buurman related to the lack of medical care he received at CCJ.[9] (Doc. No. 1.) Duckett subsequently filed several letters addressed to the Court, including a letter dated August 16, 2018, in which he stated that he was "[wri]ting this Court to apol[o]g[ize] for all the stuff [he had] put this Court th[r]ough over [his] health matter and l[e]g[a]l[ ] matters" and that he was "over all of this . . . ." (Doc. No. 29, PageID# 214, 215.) The Court construed Duckett's letter as a request to voluntarily dismiss this case under Federal Rule of Civil Procedure 41(a)(1)(A), granted the request, and closed the case. (Doc. No. 30.) Duckett filed a motion for reconsideration (Doc. No. 31), a motion to reopen the case (Doc. No. 34), and two letters (Doc. Nos. 32, 33) explaining that he did not intend for the Court to dismiss this action in response to his August 16, 2018 letter. The Court granted Duckett's motions and reopened the case on November 1, 2018. (Doc. No. 35.)

On December 26, 2018, the Court granted Duckett's application to proceed *in forma pauperis* and granted Duckett permission to file an amended complaint. (Doc. No. 41.) Duckett

---

[9]     Under the standard governing filings by pro se incarcerated litigants—known as the "prison mailbox rule"—"a pro se prisoner's [pleading] is deemed filed when it is handed over to prison officials for mailing to the court." *Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (citing *Richard v. Ray*, 290 F.3d 810, 812–13 (6th Cir. 2002)). The rationale for this rule is that "pro se prisoners have no control over delays between the prison authorities' receipt of [a pleading] and its filing, and their lack of freedom bars them from delivering the [pleading] to the court clerk personally." *Houston v. Lack*, 487 U.S. 266, 273–74 (1988). Courts assume, "absent contrary evidence," that an incarcerated person delivered a legal filing to prison authorities "on the date he or she signed [it]." *Brand*, 526 F.3d at 925. Accordingly, all dates for Duckett's filings discussed in this Report and Recommendation refer to the dates on which Duckett signed his filings. This Court previously found that Duckett filed his original complaint on February 28, 2018. (Doc. No. 44.)

17

filed an amended complaint against Cox, Claflin, Shelton, Buurman, and Carlton on February 7, 2019. (Doc. No. 42.) The Court screened the amended complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A, finding that Duckett had stated colorable claims for deliberate indifference to his serious medical needs against Cox in his official capacity and against Claflin, Shelton, Buurman, and Carlton in their individual capacities. (Doc. No. 44.) However, the Court found that "all Section 1983 claims arising from events that occurred prior to February 28, 2017 [we]re time barred under the governing one year statute of limitations" (*id.* at PageID# 339) and dismissed those claims along with the other remaining claims alleged in Duckett's amended complaint (Doc. Nos. 44, 45).

On August 28, 2019, the Court granted Duckett's motion for leave to file a second amended complaint. (Doc. No. 80.) The second amended complaint, which is the operative pleading, alleges that Claflin, Shelton, Buurman and Carlton were deliberately indifferent to Duckett's serious medical needs because they knew that he had Hepatitis C and a mass on his liver but refused to provide or delayed providing blood work and other tests while telling Duckett that nothing was wrong with him. (Doc. No. 81.) It further alleges that these defendants' actions, or inactions, are attributable to a "Cumberland County policy of refusing to provide medical care to certain inmates who may be released soon as a cost-saving measure[.]" (*Id.* at PageID# 457, ¶ 12.) Duckett's second amended complaint requests money damages, including the costs of his medical bills. (Doc. No. 81.)

Cox, Claflin, Shelton, and Carlton answered Duckett's second amended complaint (Doc. Nos. 83, 149) and Buurman filed a motion to dismiss (Doc. No. 85).[10] The Magistrate Judge

---

[10]    The Court explained in a prior order that Carlton was inadvertently terminated as a defendant in this action after the Court screened Duckett's first amended complaint. (Doc.

recommended denying Buurman's motion to dismiss (Doc. No. 127), Buurman did not object to that recommendation, and the Court accepted it and denied Buurman's motion to dismiss on August 13, 2020, for the reasons stated in the Magistrate Judge's report and recommendation (Doc. No. 131). The Court then entered an amended scheduling order (Doc. No. 153) and the parties engaged in discovery.

The defendants filed motions for summary judgment on July 23, 2021 (Doc. Nos. 183, 184), with supporting memoranda of law (Doc. Nos. 185, 187), statements of undisputed material facts (Doc. Nos. 186, 189), and declarations (Doc. Nos. 184-1–184-3, 188-1–188-3). Claflin, Shelton, Buurman and Carlton argued that they were entitled to qualified immunity from Duckett's claims. (Doc. Nos. 185, 187.) Carlton further argued that Duckett's claims against her were barred by the relevant statute of limitations. (Doc. No. 185.) Cox argued that he was entitled to summary judgment on Duckett's official-capacity claims against him because the record evidence did not show any constitutional violations caused by a county policy. (Doc. No. 187.) Duckett filed a sworn response in opposition to the defendants' motions (Doc. No. 204), statements of material facts (Doc. Nos. 198, 203), declarations (Doc. Nos. 199–202,) and exhibits from his detention at CCJ (Doc. No. 205–205-3). He argued that the record evidence showed that the defendants were deliberately indifferent to his serious medical needs. (Doc. No. 204.) Cox, Claflin, and Shelton filed a reply in support of their motion for summary judgment that addressed Duckett's various filings in opposition to their motion (Doc. No. 206) and filed a second declaration by Claflin with supporting exhibits (Doc. Nos. 207–207-3). Buurman and Carlton did not file an optional reply.

---

No. 130.) That error has been corrected and Carlton subsequently filed an answer to Duckett's second amended complaint (Doc. No. 149).

The Court has written at length in other orders about Duckett's motions requesting the Court's assistance in obtaining his medical records from TDOC's Morgan County Correctional Complex (MCCX), where Duckett was incarcerated after being transferred from CCJ. (Doc. Nos. 100, 215, 217, 222, 224, 231.) After protracted efforts, Duckett finally received 992 pages of his medical records from MCCX on January 20, 2022 (Doc. Nos. 223, 228, 228-1, 228-3), more than two years after the Court first directed the MCCX warden to provide them (Doc. No. 100). The records were also provided to the defendants. (Doc. No. 223, 225, 226.) Because the records were potentially relevant to determining whether Duckett's health worsened as a result of the defendants' actions or inactions while Duckett was incarcerated at CCJ, the Court directed the Clerk of Court to administratively terminate the defendants' summary judgment motions "without prejudice to refiling after the parties ha[d] had an adequate opportunity to review [Duckett's MCCX medical] records." (Doc. No. 227, PageID# 1524.)

### 2. The Defendants' Renewed Motions for Summary Judgment

Cox, Claflin, and Shelton filed a renewed motion for summary judgment on February 1, 2022. (Doc. No. 234.) The supporting memorandum of law (Doc. No. 235), statement of undisputed material facts (Doc. No. 237), and declarations (Doc. Nos. 236-1–236-3) that Cox, Claflin, and Shelton filed with their renewed motion are essentially identical to the documents they filed in support of their first motion for summary judgment. (Doc. Nos. 187, 188-1–188-3, 189.) Claflin and Shelton argue that they are entitled to qualified immunity from Duckett's claims because Duckett cannot show, based on record evidence, that Claflin and Shelton were deliberately indifferent to his serious medical needs in violation of his constitutional rights. (Doc. No. 235.) Even if he could, Claflin and Shelton argue that they are entitled to qualified immunity because Duckett cannot show that their conduct violated any clearly established rights. (*Id.*) Cox argues that he is entitled to summary judgment on Duckett's official-capacity claim against him because

the record evidence is insufficient to support a finding that Duckett suffered a constitutional violation caused by a county policy. (*Id.*)

Duckett filed responses in opposition to Cox, Claflin, and Shelton's motion for summary judgment (Doc. Nos. 246, 250) and sworn responses to their statement of undisputed material facts (Doc. No. 247) and to Cox's and Shelton's declarations (Doc. Nos. 248, 249). He also filed additional exhibits. (Doc. No. 250-1.) Duckett argues that the record evidence demonstrates that he had a serious medical need for care regarding his liver and abdominal pain and that these "defendants played an active role in . . . allowing Duckett to suffer inhumane treatment in pain and suffering" and "sen[t] Duckett to T.D.O.C. as a county inmate knowing that he was sick and needed treatment . . . ." (Doc. No. 250, PageID# 1797.)

Cox, Claflin, and Shelton filed a reply in support of their motion for summary judgment reiterating their arguments that there is insufficient evidence to establish any constitutional violations in this case. (Doc. No. 254.) They also filed a second declaration from Claflin with exhibits regarding Duckett's kiosk messages addressed to Cox.[11] (Doc. Nos. 255–255-3.)

Buurman and Carlton filed a renewed motion for summary judgment on February 11, 2022. (Doc. No. 241.) The supporting memorandum of law Buurman and Carlton filed (Doc. No. 242) is substantially similar to the memorandum of law they filed in support of their first motion for summary judgment (Doc. No. 185). The statement of undisputed material facts (Doc. No. 244) and declarations (Doc. Nos. 243-1–243-3) Buurman and Carlton filed in support of their renewed motion for summary judgment are identical to the statement of undisputed material facts (Doc. No. 186) and declarations (Doc. Nos. 184-1–184-3) they filed in support of their first motion for

---

[11]    Cox, Claflin, and Shelton also filed a motion to strike Duckett's response in opposition to their renewed summary judgment motion as untimely. (Doc. No. 252.) The Court has denied that motion in a concurrently issued order.

summary judgment. Buurman and Carlton argue that they, too, are entitled to qualified immunity from Duckett's claims because Duckett cannot establish a constitutional violation based on the record evidence. (Doc. No. 242.) Carlton further argues that Duckett's claims against her are barred by the relevant statute of limitations because she stopped working at CCJ in August 2017 and Duckett did not bring claims against her until he filed his first amended complaint on February 7, 2019. (*Id.*)

Duckett responded in opposition to Buurman and Carlton's renewed summary judgment motion on March 1, 2022 (Doc. No. 250) and filed a sworn response in opposition to Buurman's second declaration (Doc. No. 251).[12] Duckett argues that Buurman "knew that [Duckett] needed more tests and treatment" but did not provide them and "repeatedly told Duckett that his health 'was good[.]'" (Doc. No. 250, PageID# 1797.) He argues that Carlton "never gave [him] blood work in 2015 and 2016[.]" (*Id.* at PageID# 1802.)

Buurman and Carlton did not file an optional reply.[13]

## II.    Legal Standard

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may

---

[12]    Duckett did not specifically respond to Buurman and Carlton's second statement of undisputed material facts. However, because Buurman and Carlton's second statement of undisputed material facts (Doc. No. 244) is identical to their first statement of undisputed material facts (Doc. No. 186), the Court will consider Duckett's response to Buurman and Carlton's first statement of undisputed material facts (Doc. No. 203).

[13]    On August 7, 2022, Duckett filed a supplemental declaration and memorandum of law addressing the defendants' renewed summary judgment motions. (Doc. No. 263.) The defendants have moved to strike this late filing. (Doc. Nos. 264, 265.) The Court has not considered Duckett's supplemental filing in the course of resolving the defendants' renewed summary judgment motions.

reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, if the moving party carries its initial

burden, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

## III.      Analysis

"Section 1983 provides a civil enforcement mechanism for all inmates [and pretrial detainees] who suffer constitutional injuries at the hands of '[a]ny person acting under color of state law.'" *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008) (second alteration in original) (quoting 42 U.S.C. § 1983). To prevail on a § 1983 claim, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)). Duckett alleges that Claflin, Shelton, Buurman, and Carlton were deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Duckett further argues that Cox, in his official capacity as the Cumberland County Sheriff, is also liable for these constitutional violations because Claflin, Shelton, Buurman, and Carlton acted pursuant to county policy.

The defendants have not disputed that they are state actors for purposes of liability under § 1983, and the Courts finds that each defendant acted under color of state law within the meaning of the statute. *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 55–56 (1988) (holding that physicians employed by the state to provide prison medical care are state actors for purposes of § 1983 regardless of whether they are state employees or contractors); *Hammonds v. L.P.N. John*, No. 3:15-cv-01141, 2016 WL 109976, at *2 (M.D. Tenn. Jan. 8, 2016) (finding that "[t]he medical staff members and jail administrator for the Williamson County Jail are persons acting under color of state law for purposes of § 1983"). The only question before the Court at summary judgment is

24

whether there are genuine issues of material fact that the defendants deprived Duckett of his constitutional rights.

### A.    Duckett's Individual Capacity Claims Against Claflin and Shelton

Claflin and Shelton raise qualified immunity as an affirmative defense to Duckett's claims. (Doc. No. 235.) "The qualified-immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights." *Quigley v. Thai*, 707 F.3d 675, 680 (6th Cir. 2013). The goal behind qualified immunity is to "'balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Richko v. Wayne Cnty.*, 819 F.3d 907, 914 (6th Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "[A] defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson*, 555 U.S. at 232). Where defendants invoke qualified immunity and carry their initial summary judgment burden, "the plaintiff bears the burden to show that qualified immunity is inappropriate." *Quigley*, 707 F.3d at 681.

Even if the plaintiff can show a genuine question of material fact as to whether the defendants violated his constitutional rights, defendants are still entitled to qualified immunity if those rights were not clearly established at the time of violation. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). In other words, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741

(2011)). "The precedent clearly establishing a right can be in the form of a case of 'controlling authority or a robust consensus of cases of persuasive authority.'" *Latits v. Phillips*, 878 F.3d 541, 552 (6th Cir. 2017) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014)).

Duckett asserts that Claflin and Shelton were deliberately indifferent to his serious medical needs. The Eighth Amendment, which applies to state governments like Cumberland County through the Fourteenth Amendment, "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' towards the inmate's serious medical needs." *Berkshire v. Beauvais*, 928 F.3d 520, 535 (6th Cir. 2019) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004)). Pretrial detainees like Duckett "have a constitutional right to be free from deliberate indifference to serious medical needs under the Due Process Clause of the Fourteenth Amendment." *Greene v. Crawford Cnty.*, 22 F.4th 593, 605 (6th Cir. 2022). Federal courts have long recognized that a pretrial detainee's "due process rights to medical care 'are at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Id.* (quoting *Griffith v. Franklin Cnty.*, 975 F.3d 554, 566 (6th Cir. 2020)).

"Until recently, [the Sixth Circuit] 'analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims "under the same rubric."'" *Id.* (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 597 (6th Cir. 2021)). An Eighth Amendment deliberate indifference claim against an individual actor has objective and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Blackmore*, 390 F.3d at 895. The objective component requires showing "the existence of a "sufficiently serious" medical need. *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Richmond v. Huq*, 885 F.3d

26

928, 938 (6th Cir. 2018) (emphasis in original) (quoting *Blackmore*, 390 F.3d at 897). "The subjective component requires a plaintiff to show that 'each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it.'" *Greene*, 22 F.4th at 605–06 (quoting *Griffith*, 975 F.3d at 568). This showing "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, and is instead "equivalent to criminal recklessness[,]" *Greene*, 22 F.4th at 606 (quoting *Griffith*, 975 F.3d at 568).

While the objective prong of the Eighth Amendment analysis still applies to Fourteenth Amendment pretrial detainee claims, the Sixth Circuit modified the subjective prong for Fourteenth Amendment claims in *Brawner v. Scott County* in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *Brawner*, 14 F.4th at 594–97. In *Kingsley*, the Supreme Court considered whether a pretrial detainee alleging excessive force in violation of the Fourteenth Amendment "must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable." 576 U.S. at 391–92. The Supreme Court held that the objective "standard is the correct one." *Id.* at 392. "In reaching that answer, the [Supreme] Court focused in part on the differences between the [Fourteenth Amendment's] Due Process Clause and the [Eighth Amendment's] Cruel and Unusual Punishments Clause." *Greene*, 22 F.4th at 606. The Supreme Court recognized that "[t]he language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all[.]" *Kingsley*, 576 U.S. at 400. "However, *Kingsley* did not address whether an objective standard applies in other Fourteenth Amendment pretrial-detainment contexts." *Brawner*, 14 F.4th at 592.

In *Brawner*, the Sixth Circuit joined the Second, Seventh, and Ninth Circuits in "conclud[ing] that *Kingsley*'s reasoning required 'modification of the subjective prong of the deliberate-indifference test for pretrial detainees.'" *Greene*, 22 F.4th at 606 (quoting *Brawner*, 14 F.4th at 596). Under *Brawner*, a pretrial detainee alleging deliberate indifference to his or her serious medical needs "must prove 'more than negligence but less than subjective intent— something akin to reckless disregard.'" *Brawner*, 14 F.4th at 596 (quoting *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)). "In other words, a plaintiff must prove that the defendant acted 'deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Greene*, 22 F.4th at 606 (alteration in original) (quoting *Brawner*, 14 F.4th at 597).

Thus, under current Sixth Circuit precedent, to prevail at summary judgment on a Fourteenth Amendment claim for deliberate indifference, a pretrial detainee "must 'present evidence from which a reasonable jury could find that (1) that [the detainee] had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore [the detainee's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to' the detainee."[14] *Id.* at 607 (alterations in original) (quoting *Brawner*, 14 F.4th at 597).

---

[14]     The Sixth Circuit offered a different formulation of this standard in *Trozzi v. Lake County*, 29 F.4th 745, 757–58 (6th Cir. 2022), stating that the "three elements for an inadequate-medical-care claim under the Fourteenth Amendment" are:

> (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk.

Even assuming that Duckett had a sufficiently serious medical need, the record evidence construed in the light most favorable to Duckett does not support a finding that either Shelton or Claflin "'recklessly failed to act reasonably'" with respect to Duckett's medical care. *Greene*, 22 F.4th at 607 (quoting *Brawner*, 14 F.4th at 597). "As a general rule, a patient's disagreement with his physicians [or other medical providers] over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

---

At least one Sixth Circuit judge has noted the confusion arising from *Trozzi* and a few other Sixth Circuit cases applying *Brawner*'s standard:

> [O]ur circuit has struggled with how to apply the *Brawner* test in medical-needs cases. *See, e.g.*, *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022); *Smith v. Boyd Cnty. Fiscal Ct.*, No. CV 20-14-HRW, 2022 WL 992768, at *7 (E.D. Ky. Mar. 31, 2022). Did *Brawner* obviate an inquiry into defendants' mental states? *See Britt v. Hamilton Cnty.*, No. 21-3424, 2022 WL 405847, at *6–7 (6th Cir. Feb. 10, 2022) (Clay, J., dissenting). Did it merely modify that inquiry? *See Greene v. Crawford Cnty.*, 22 F.4th 593, 606 (6th Cir. 2022). And in so doing, did *Brawner* leave a subjective inquiry in place? *See Trozzi v. Lake Cnty.*, 29 F.4th 745, 754–55 (6th Cir. 2022).

*Westmoreland v. Butler Cnty.*, 35 F.4th 1051, 1052 (6th Cir. 2022) (Bush, J., dissenting from denial of rehearing en banc).

While such questions may remain about *Brawner*'s application in particular factual settings, there is no question that every published Sixth Circuit opinion post-*Brawner* agrees that *Brawner* is binding precedent and must be applied to deliberate indifference claims brought under the Fourteenth Amendment. *See, e.g.*, *Greene*, 22 F.4th at 607 (rejecting argument that *Brawner*'s modification of the subjective prong for Fourteenth Amendment deliberate indifference claims was non-binding dicta); *Trozzi*, 29 F.4th at 752 (holding that, "[g]oing forward, we are bound by *Brawner*'s views" that *Kingsley* requires modification of the subjective prong). The Court will therefore apply the Fourteenth Amendment deliberate indifference standard as articulated in *Brawner* and applied in *Greene*.

The record evidence shows that Shelton promptly responded to Duckett's medical resident requests, examined or spoke with Duckett four times between October 2017 and April 2018, and made an appointment for Duckett to see Dr. Hendrixson at Duckett's request. Duckett argues that Shelton contributed to the delay in Duckett receiving the CT scans that Florence prescribed and refused to explain the results of Duckett's April 2018 CT scan to him, but there is insufficient evidence in the record to support a reasonable jury finding that Shelton acted "recklessly 'in the face of an unjustifiably high risk of harm that [was] either known or so obvious that it should [have] be[en] known.'" *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836).

Further, if a plaintiff's deliberate indifference claim "is based on 'the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious,' the plaintiff must 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment[.]'" *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (first quoting *Blackmore*, 390 F.3d at 898; and then quoting *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001)). Where, as here, a plaintiff "complains that he was delayed in receiving a *specific type* of medical treatment, . . . [h]e . . . disputes the adequacy of the treatment he received during that period." *Id.* at 591. Duckett argues generally that his health "did get worse over this time" (Doc. No. 246, PageID# 1769) and that "the medical f[ile] . . . show[s] the w[o]rs[en]ing of [his] health matters" (*id.* at PageID# 1771), but he has not pointed to any record evidence sufficient to create a genuine dispute of material fact that any delays in treatment caused by Shelton's actions had a detrimental effect on his health. Instead, the notes from Duckett's appointment with Hendrixson show that Duckett did not have liver cancer and "just need[ed] to be followed" approximately "every 6 months . . . ." (Doc. No. 205, PageID# 1303; Doc. No. 236-3, PageID# 1705.)

The record further shows that Claflin responded to Duckett's resident requests and repeatedly conferred with Shelton and other CCJ medical staff about Duckett. Duckett has not pointed to any record evidence to support a reasonable jury finding that Claflin acted recklessly in the face of an unjustifiably high risk of harm to Duckett that was either known or so obvious that it should have been known.

Accordingly, the Court should find that there is no genuine dispute of material fact that Shelton and Claflin did not violate Duckett's constitutional right to adequate medical care while incarcerated and that Shelton and Claflin are therefore entitled to qualified immunity from Duckett's claims against them in this action.

**B.    Duckett's Individual Capacity Claims Against Buurman and Carlton**

Buurman and Carlton also assert qualified immunity as an affirmative defense to Duckett's deliberate indifference claims against them. (Doc. No. 242.) Although neither is a government official, Buurman and Carlton argue that "[p]hysicians who contract with correctional facilities are permitted to invo[k]e the [d]octrine of [q]ualified [i]mmunity." (*Id.* at PageID# 1736.) Buurman and Carlton cite two cases in support of this argument—*Richardson v. McKnight*, 521 U.S. 399, 407 (1997), and *Harrison v. Ash*, 539 F.3d 510, 522 (6th Cir. 2008). Neither case establishes that Buurman and Carlton may invoke qualified immunity under the circumstances presented here.

In *Richardson v. McKnight*, the Supreme Court explained that, in deciding whether or not private defendants "enjoy a qualified immunity from suit under § 1983[,]" courts "look both to history and to the purposes that underlie government employee immunity . . . ." 521 U.S. at 404 (citing *Wyatt v. Cole*, 504 U.S. 158, 164 (1992)). The parties invoking qualified immunity in *Richardson* were private prison guards who worked "for a large, multistate private prison management firm." *Id.* at 409. Applying the history and purpose factors, the Supreme Court held

"that private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case." *Id.* at 412.

Buurman and Carlton have not presented any argument or explanation as to how *Richardson* supports their invocation of qualified immunity in this case. They reference a segment of the *Richardson* decision in which the Supreme Court found, in analyzing the history of immunity for prison guards, that English common "law *did* provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign." *Id.* at 407. But that brief mention does not direct that private doctors treating prisoners be afforded qualified immunity today. As the Eleventh Circuit explained:

> although the Supreme Court, in passing, mentioned that "apparently, [in England], the law did provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign," *see Richardson*, 521 U.S. at 407, the circumstances here do not seem to be the kind of situation encompassed by that statement. The sources cited by the Court suggest that, under certain circumstances, English doctors and lawyers were immune from liability for acts amounting to negligence. For acts amounting to recklessness or intentional wrongdoing, as are alleged here, immunity did not exist, however. *See Tower v. Glover*, 467 U.S. 914, 920–22 (1984) (stating that "English barristers enjoyed in the 19th Century . . . a broad immunity from liability for negligent misconduct . . . . Nevertheless, it appears that even barristers have never enjoyed immunity from liability for intentional misconduct"); Joel P. Bishop, *Commentaries on Non–Contract Law* § 704 (Chicago, T.H. Flood & Co. 1889) (same); Bishop, supra, § 708 (1889) (stating that physicians could be liable for criminal malpractice but were likely immune from liability for civil negligence).

*Hinson v. Edmond*, 192 F.3d 1342, 1345–46 (11th Cir. 1999) (alterations in original), *amended on other grounds* 205 F.3d 1264 (11th Cir. 2000). The Sixth Circuit has similarly distinguished *Richardson*'s dicta about common law immunity for doctors and has held "that there was no common-law tradition of immunity for a private doctor working for a public institution at the time that Congress passed § 1983." *McCullum v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012).

Nor have Buurman and Carlton presented any argument or explanation regarding how *Harrison v. Ash* supports their invocation of qualified immunity in this case. In *Harrison v. Ash*,

the Sixth Circuit applied the history and purpose factors in holding that nurses who were employed by a private company and worked in a public jail could not invoke qualified immunity in defense to § 1983 claims. 539 F.3d at 521–25. The Sixth Circuit distinguished the Supreme Court's dicta in *Richardson* by relying on the Eleventh Circuit's reasoning in *Hinson*, and "conclude[d] that there is no 'firmly rooted' common law practice of extending immunity to private[ly]" employed nurses working in public jails. *Id.* at 522.

Even if *Richardson* and *Harrison* could be read to support a finding that the history factor weighs in favor of permitting Buurman and Carlton to invoke qualified immunity here, these defendants have not addressed the purpose factor required to establish that private actors may invoke qualified immunity in particular circumstances. They therefore have not shown on this record that, as private doctors paid to work in a public jail, they are entitled to invoke qualified immunity as an affirmative defense to Duckett's § 1983 claims against them. However, they have shown that they are entitled to summary judgment based on a finding that there are no genuine disputes of material fact that they did not violate Duckett's constitutional rights.

Duckett argues that Carlton was deliberately indifferent to his serious medical needs because she "never gave [him] blood work in 2015 and 2016[.]" (Doc. No. 250, PageID# 1802.) The Court has already dismissed Duckett's claims based on Carlton's actions before February 28, 2017 as untimely. (Doc. Nos. 44, 45.) The only record evidence regarding Carlton's actions after that date concern Duckett's nursing visit on July 9, 2017, before he was released on July 10, 2017. The notes from the nursing visit state that Duckett said he "ha[d] [pre]script[ion]s for some imaging" of "a mass in his liver, abdomen and pancreas[,]" that "he f[elt] safe to go [in]to [the general] population" at CCJ, and that he "refused to sign a medical release form." (Doc. No. 236-2, PageID# 1656.) Carlton states that she reviewed these notes (Doc. No. 243-2), and the copy of

the notes in the record shows the initials "SC" next to the date "7-11-17" (Doc. No. 236-2, PageID# 1656.) Duckett has not disputed that Carlton reviewed these notes. Construing this record evidence in the light most favorable to Duckett, no reasonable jury could find that Carlton acted recklessly in the face of an unjustifiably high risk of harm to Duckett that was either known or so obvious that it should have been known.

Duckett argues that Buurman was deliberately indifferent to his serious medical needs because Buurman "knew that [Duckett] needed more tests and treatment" but did not provide them and "repeatedly told Duckett that his health 'was good[.]'" (Doc. No. 250, PageID# 1797.) The undisputed record evidence shows that Duckett returned to CCJ on or about October 15, 2017; requested CT scans based on Florence's prescriptions on October 26, 2017; signed a medical release on November 16, 2017; and wrote letters to Buurman regarding the mass on his liver on November 24, 2017, and December 1, 2017. Buurman examined Duckett and ordered bloodwork and an ultrasound of Duckett's liver on December 7, 2017. The bloodwork was drawn on December 8, 2017, Buurman reviewed the results and noted that Duckett was scheduled for a liver ultrasound soon, and the ultrasound took place on December 19, 2017. Buurman ordered a CT scan of Duckett's abdomen with contrast on March 1, 2018, Duckett received that CT scan on March 7, 2018, and the CT report recommended an MRI or CT with liver protocol. Buurman ordered a second CT scan with liver protocol later that month. Duckett received an abdominal CT with and without IV contrast on April 4, 2018, and the resulting CT report did not find evidence of liver cancer but recommended continued surveillance. Sometime later, after Duckett wrote to Hendrixson, Buurman ordered additional bloodwork with specific tumor marking testing as recommended by Hendrixson. The results of that bloodwork, run in June 2018, were reviewed by Hendrixson at a July 2018 appointment with Duckett scheduled with Buurman's approval.

34

Hendrixson concluded that Duckett did not have liver cancer and just needed to be monitored every six months.

Construing this evidence in the light most favorable to Duckett, no reasonable jury could find that Buurman acted recklessly in the face of an unjustifiably high risk of harm to Duckett that was either known or so obvious that it should have been known. There is no genuine dispute based on the record evidence that Buurman ordered three rounds of imaging and two rounds of blood work for Duckett during Duckett's approximately nine-month period of incarceration at CCJ from October 2017 to July 2018. Duckett's "desire for additional or different treatment does not suffice by itself to support" a constitutional deliberate indifference claim. *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014); *see also Darrah*, 865 F.3d at 372 ("As a general rule, a patient's disagreement with his physicians over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983."). Further, Duckett has not pointed to any evidence in the record sufficient to create a genuine dispute of material fact that any delays in treatment caused by Buurman's actions had a detrimental effect on Duckett's health. *See Santiago*, 734 F.3d at 590.

Carlton and Buurman are therefore entitled to summary judgment on Duckett's deliberate indifference claims against them.

### C. Duckett's Official Capacity Claim against Cox

It is well established that claims against an individual in his or her official capacity may be treated as municipal liability claims against the entity for which the individual is an officer or agent. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The Supreme Court has held "that a municipality can be found liable under § 1983 . . . where the municipality *itself* causes the constitutional violation at issue" through execution of its own policies or customs. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. NYC Dep't of Soc. Servs.*, 436 U.S. 658, 694–

95 (1978)). The overarching question in resolving such claims is "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.* For purposes of municipal liability claims, "individuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003). Here, Cox is a proxy for Cumberland County.

Courts in this circuit engage in a two-pronged inquiry when considering municipal liability claims under § 1983. *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 606–07 (6th Cir. 2007) (quoting *Cash v. Hamilton Cnty. Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004)); *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505 (6th Cir. 1996) (explaining that "[a] municipal liability claim . . . must be examined by applying a two-pronged inquiry"). "We first ask whether the plaintiff has asserted the deprivation of a right guaranteed by the Constitution or federal law." *Powers*, 501 F.3d at 607 (first citing *Cash*, 388 F.3d at 542; and then citing *Alkire*, 330 F.3d at 813). Second, we ask whether the defendant entity is "responsible for that deprivation." *Cash*, 388 F.3d at 542 (citing *Doe*, 103 F.3d at 507); *cf. Powers*, 501 F.3d at 607 (asking "whether the alleged deprivation was caused by the defendants . . .").

Here, because there is no genuine dispute of material fact that Duckett was not deprived of his constitutional right to adequate medical care while incarcerated, his official-capacity claim against Cox fails and Cox is entitled to summary judgment as a matter of law. *Cf. City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (holding that *Monell* does not "authorize[ ] the award of damages against a municipal corporation based on the actions of one of its officers when . . . [a] jury has concluded that the officer inflicted no constitutional harm").

**IV.    Recommendation**

For these reasons, the Magistrate Judge RECOMMENDS that the Court GRANT the defendants' renewed motions for summary judgment (Doc. Nos. 234, 241) and enter judgment in their favor.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 19th day of August, 2022.

ALISTAIR E. NEWBERN
United States Magistrate Judge